TIMOTHY COURCHAINE
United States Attorney
District of Arizona

LATANYA L. WATELAND
Arizona State Bar No. 031747
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: latanya.wateland@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>1. USDT tokens in the amount of 1,525,028.200939;<br><br>2. USDT tokens in the amount of 1,729,218.135472,<br><br>Defendants *in Rem*. | Case No.<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## NATURE OF THE ACTION

1. This is a civil action *in Rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of virtual currency, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), including but not limited to wire fraud, 18 U.S.C. § 1343, or a conspiracy to commit such offense.

2. This is a civil action *in Rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) for the forfeiture of virtual currency, which is involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or a conspiracy to

commit such offense.

3. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

## DEFENDANTS *IN REM*

4. The Defendants *in Rem* consist of virtual currency, specifically USDT tokens that were associated with two separate virtual currency addresses (collectively the "defendant property"). Tether was served a federal seizure warrant to seize the funds associated with the defendant property. After Tether received the seizure warrant, Tether "burned" (*i.e.*, destroyed) the USDT tokens associated with the defendant property and reissued the equivalent amount of USDT tokens to a government-controlled wallet.

5. Defendant *in Rem* Number 1 consists of 1,525,028.200939 USDT tokens that were associated with the virtual currency address 0x0e571d7F200B3d2b1CDD4538F8ad434AE4b7840C on the Ethereum network (hereinafter "USDT Address 1").

6. Defendant *in Rem* Number 2 consists of 1,729,218.135472 USDT tokens that were associated with the virtual currency address 0xF92AAA976ba32451Aa6FCEff9B61397e02ed7d2A on the Ethereum network (hereinafter "USDT Address 2").

7. Defendants *in Rem* Number 1 and 2 are currently in the custody of the Federal Bureau of Investigation ("FBI").

## BACKGROUND ON VIRTUAL CURRENCY

8. Virtual Currency: Virtual currencies are digital tokens of value circulated over the internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank, like traditional fiat currencies such as the U.S. dollar, but are generated and controlled through computer software. Cryptocurrency is a form of virtual currency.

9. Virtual Currency Addresses: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters.

10. Blockchain: Many virtual currencies publicly record their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred using that blockchain's specific technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies. Investigators can follow or "trace" funds on public blockchains, a practice known as "blockchain analysis."

11. Blockchain Analysis: It is virtually impossible to look at a single transaction on a blockchain and immediately ascertain the identity of the individual behind the transaction. That is because blockchain data generally consists only of alphanumeric strings and timestamps. But law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to determine whether that same individual is connected to other relevant addresses on the blockchain. To analyze blockchain data, law enforcement can use blockchain explorers as well as commercial services offered by blockchain analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

12. Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through

algorithmic mechanisms of buying and selling the reference asset or its derivatives. Tether Limited (Tether) is a company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT tokens. USDT tokens are on the Ethereum and TRON blockchains, among others. USDC is also a stablecoin.

13. Ether: Ether ("ETH") is the native cryptocurrency on the Ethereum network.

**INTRODUCTION**

14. The purpose of this forfeiture action *in Rem* is to establish the government's clear title to the defendant property. The defendant property was swindled from victims through the course of an investment fraud scam. The defendant property was laundered through a circuitous web of virtual currencies, wallet addresses, and blockchains. Following the government's seizure of the defendant property, the government now seeks to clear title so that, subject to the Attorney General's authority under 18 U.S.C. § 981(d) to dispose of petitions for remission of forfeited property, the defendant property may be returned to the victims of the fraud described herein.

15. The cryptocurrency seized in this matter is derived from an investment fraud scam, commonly referred to as "pig butchering," perpetrated on victims throughout the United States, including the District of Arizona. The scheme generally begins when the victims are contacted through social media platforms or messaging services. From there, the scammer will try to establish a more personal relationship with the victim by using manipulative tactics like those used in online romance scams.

16. The victims are directed to fraudulent websites and instructed to download an application from that website. The victims are then instructed to invest funds by making cryptocurrency purchases and transferring the cryptocurrency to wallet addresses controlled by the scammers. After the cryptocurrency transfers occur, the fraudulent investment platform website or application reflects the victims' deposits. For the next month or so, the fraudulent investment platform website or application appears to reflect large financial gains in the victims' accounts, often causing the victims to invest more funds. However, the investment gains displayed on the fraudulent investment platform

website or application are fabricated.

17. When the victims try to withdraw their funds, they are advised they are unable to make a withdrawal by the fraudulent investment platforms' "customer service" team. The "customer service" team tells the victims various excuses as to why the funds are unable to be withdrawn. In some cases, they instruct the victims to pay taxes or additional fees under the guise that such fees and taxes will allow a release of the victims' funds. After a period of time, and even if the victim pays the taxes or fees, the victims are locked out of their accounts and lose all their funds, ultimately causing the victims financial and emotional losses. Other times, victims are unable to access the fictitious cryptocurrency website because it is no longer functional.

## BACKGROUND

18. Beginning in March of 2022, the FBI's Tucson Resident Agency ("TRA") field office, identified numerous victims of a pig butchering scheme on multiple fraudulent investment platforms.

19. The first section below discusses the fraudulent pig butchering scheme experienced by several victims. The second section below shows how the victims' funds were traced from the victims' accounts to USDT Address 1 and USDT Address 2 that are the defendant property. Finally, the third section below shows the connections between USDT Address 1 and USDT Address 2. All dates are on or about the date specified. All amounts are approximate.

20. FBI investigators identified at least six victims whose stolen funds were directed to USDT Address 1.[1]

21. FBI investigators also identified at least eight victims whose stolen funds were directed to USDT Address 2.[2]

---

[1] Of the six identified victims, four victims were interviewed over the phone by the FBI. The other two victims filed a complaint online at IC3.gov, and each victim outlined a similar pig butchering scheme as the victims that were interviewed over the phone.

[2] Of the eight identified victims, five victims were interviewed over the phone by the FBI. The other three remaining victims filed a complaint online at IC3.gov, and each victim outlined a similar pig butchering scheme as the ones that were interviewed over the phone.

**VICTIM FUNDS DIRECTED TO USDT ADDRESS 1 AND USDT ADDRESS 2**

**Victim C.S.**

22. In November of 2021, C.S., a female who currently resides in Texas, was contacted via a random text message on WhatsApp[3], by a female who identified herself as "Lin."

23. The text message from Lin was in reference to securing a contract.

24. When C.S. confronted Lin about texting the wrong number, Lin introduced herself. C.S. texted back to be friendly, and they both began to text each other back and forth.

25. Lin portrayed herself as kindhearted, extremely wealthy, and a successful philanthropist who lived in Hong Kong.

26. Approximately a month after getting to know each other, Lin asked C.S. how she invested her money. Thinking Lin was a successful businesswoman, C.S. accepted Lin's offer to help her with cryptocurrency investing because this was something C.S. was interested in starting.

27. Lin told C.S. she had an uncle who operated an investment firm in Hong Kong and he had a cadre of researchers who worked for him. Those researchers could detect "trading signals." Lin explained that "trading signals" were a time in the market to buy and or sell cryptocurrency for profit.

28. Believing the information provided by Lin, C.S. started trading small and converted $10,000 United States dollars ("USD") into cryptocurrency.

29. Lin showed C.S. how to establish accounts with the cryptocurrency exchange Gemini[4] and with the online investment trading platform at www.ubaying.com ("UBAY")[5]. Lin showed C.S. how to transfer funds from her personal banking account,

---

[3] WhatsApp is a phone application that can be downloaded to most phones and provides a secure encrypted form of text message communication.

[4] Gemini is a digital asset trading platform where users can buy, sell, store, and manage cryptocurrencies. Gemini is a legitimate cryptocurrency exchange platform.

[5] UBAY was a suspected fraudulent website and is no longer a working website.

into her newly created cryptocurrency account, and finally into her UBAY account.

30. When trading signals were detected, Lin would text C.S. and give her step-by-step instructions on how to proceed. C.S. would take screenshots and send them to Lin, who would then then tell her exactly what buttons to press.

31. After a few trades directed by Lin, C.S. always saw the same results, a twenty percent profit return on her investment. Seeing such positive results, C.S. invested an additional $100,000 USD.

32. After a few more trades directed by Lin, Lin started to get pushy with C.S. and told C.S. once her principle reached one million dollars, her profit margin would increase to thirty percent. C.S. then took money out of her personal investments.

33. Lin told C.S. she needed to withdraw money from her Individual Retirement Account ("IRA") and told C.S. there would be no penalties if she put the money back within 60 days.

34. Lin told C.S. she was already 30 days into the "trading contact" period, and there would be no problem getting the money back and returned to her IRA.

35. C.S. withdrew $300,000 from her IRA and converted the money into her UBAY account to invest.

36. Once the "trading contact" period came to an end, Lin told C.S. she needed to pay the capital gains tax before she could withdraw her assets. C.S. asked Lin why the platform could not deduct the tax from her account. Lin said she did not know and that it was just the rules of the application.

37. At this point, C.S.'s UBAY account showed a positive balance over one million dollars. Therefore, C.S. was responsible for a capital gains tax of $421,000 USD.

38. Lin referred C.S. to NerdWallet and suggested she apply for a personal loan to cover the tax.

39. C.S. did secure personal loans and liquidated another $200,000 USD from her personal investments and savings account. In total, C.S. obtained an additional $270,000 USD.

40. Because C.S. was short $151,000 USD, Lin told C.S. she could borrow the rest of the tax payment needed from Lin. Lin told C.S. she could pay back the borrowed money once she made a withdrawal.

41. When C.S. deposited her capital gains tax payment, UBAY purportedly detected unusual activity because the money was deposited from a different region. C.S. was told her account would be frozen until UBAY investigated the potential money laundering. C.S. was also informed by UBAY that to unfreeze her account, she needed to make another deposit of $100,000 USD.

42. Desperate to get her money back, C.S. secured another $45,000 USD in personal loans and liquidated the rest of her IRA.

43. C.S. then paid UBAY the $100,000 USD to unfreeze her account.

44. UBAY's customer service told C.S. she was 6,175 in the queue and UBAY only processed 20 requests per day. At that rate, C.S. would gain access to her money in 308 days.

45. UBAY offered C.S. the option of becoming a premier member for a fee of $75,000 USD. This membership would allow her to withdraw her funds within 24 hours.

46. C.S. contacted her investment broker to secure more funds. C.S's investment broker told her that he suspected she was being scammed.

47. C.S. later discovered the UBAY investment trading platform was a fake website after she was unable to log into her account.

48. C.S. filed an online report to the FBI's Internet Crime Complaint Center ("IC3") at IC3.gov.

49. In total, C.S. converted and lost approximately $1,200,000 USD.

**Victim A.V.**

50. On May 3, 2022, the FBI's Los Angeles, California Field Office telephonically interviewed A.V., a female who currently resides in California.

51. In December of 2022, A.V. was receiving treatment for a recent cycling injury from a registered nurse named Pauline Wong ("Wong").

52. Wong is from Malaysia.

53. A.V. received lymphatic drainage treatment for her injury and these sessions were typically multiple hours long.

54. During the treatment sessions, Wong and A.V. talked about various topics and got to know each other. Their conversations started casually and at some point Wong suggested A.V. start investing in cryptocurrency.

55. A.V. was hesitant and told Wong she was not knowledgeable about cryptocurrency trading or investing.

56. A.V. asked Wong to teach her about cryptocurrency trading and investing and Wong agreed to teach her.

57. Wong showed A.V. how to download the Coinbase[6] application from a website and not from an application store[7] such as Apple's application store.

58. Next, Wong gave A.V. contact information for a person named Wilson Wenhao Wong ("Wilson").

59. Wong told A.V. she met Wilson four years ago while she was in China.

60. Wong told A.V. that Wilson is a good contact for cryptocurrency investments.

61. Wong also told A.V. that Wilson lives in Washington, D.C. and his family is very wealthy because of their Chinese import/export business and investments.

62. Wilson contacted A.V. via WhatsApp and told her he had calculations and knowledge of cryptocurrency patterns and could predict the cryptocurrency market.

63. Wilson directed and helped A.V. create an account with www.zbgmin.com

---

[6] Coinbase is a legitimate US based company and cryptocurrency exchange.

[7] It is standard practice for users to download mobile applications directly from official app stores, such as the Apple App Store or Google Play Store. These stores provide a secure, centralized marketplace where applications are vetted for authenticity, security, and compliance with platform policies. Downloading apps from third-party websites is uncommon and often discouraged due to the increased risk of malware, spoofed applications, and unauthorized software.

("ZBG")[8] using her driver's license information as verification of identity.

64. With Wilson's help, A.V. agreed to start investing small with a $10,000 USD investment.

65. The next day, A.V. invested an additional $40,000 USD.

66. Utilizing screenshots sent by A.V., Wilson showed A.V. how to move money from her banking account, then convert it into her Coinbase cryptocurrency account, and finally into her ZBG trading account.

67. Wilson instructed A.V. on which trades to make using the ZBG website.

68. Initially, A.V.'s investment grew slowly, but over time her investment grew, and eventually reached $876,000 USD profit in her ZBG account.

69. In return for his help, Wilson requested A.V. send five percent of her profits to Wong. A.V. agreed to send Wong the money.

70. Wilson told A.V. the more money she had in her account and invested, the higher her profits would be.

71. A.V. contacted and encouraged her friends to also invest with Wilson and two friends agreed to invest.[9]

72. A.V.'s friends sent money to A.V.'s ZBG account for investment purposes.

73. At some point, Wilson told A.V. she was not investing enough principal and needed more money for trades to make more money.

74. Between February and March 2022, A.V. refinanced her house and converted $2,000,000 USD into her ZBG account for investment purposes.

75. Wilson also loaned A.V. money by depositing the funds into her ZBG account for A.V. to have a higher principal. This made A.V. trust Wilson even more.

76. With all the deposits into A.V.'s ZBG account, A.V. made two more trades that amounted to approximately $7,600,000 USD in profit.

---

[8] www.zbgmin.com is a fraudulent investment platform and is no longer a working website. It is similar to www.ZB.com which is a legitimate cryptocurrency exchange platform.

[9] Victims listed as J.M. and R.C. in this complaint were contacted by A.V. and invested with Wilson.

77. A.V. completed approximately 36 trades in the ZBG application. These trades appeared "successful" and generated big returns according to the fraudulent ZBG application.

78. Wilson showed A.V. how to withdraw $100,000 USD from her ZBG account and back into her Coinbase account.

79. A.V. and her friends considered forming a limited liability company investment group with Wilson.

80. A.V. then tried to empty her ZBG account by withdrawing $68,000,000 USD.

81. The withdrawal transaction was unsuccessful and flagged by ZBG. A.V.'s account was frozen due to suspicion of money laundering.

82. ZBG told A.V. the account needed to be reviewed before it could be unfrozen and asked A.V. for her driver's license, transaction information, banking statements, and a five percent fee of the total funds in the account.

83. At this point, A.V. realized the ZBG website was fraudulent, and the dollar amounts displayed in her account were fake.

84. A.V. reported the scam to her local police department and filed an online report to the FBI at IC3.gov.

85. In total, A.V. converted and lost approximately $5,200,000 USD.

**Victim J.M.**

86. In December of 2021, J.M., a male who currently resides in California, was part of a cryptocurrency trading group that included victims A.V. and R.C.

87. J.M. was contacted by A.V. and presented with an investment opportunity.

88. J.M. transferred and converted approximately $385,000 USD from his personal banking account into his Coinbase cryptocurrency account.

89. J.M. then transferred approximately $385,000 USD from his Coinbase account into A.V.'s ZBG account.

90. J.M. reported the scam online and filed a report to the FBI at IC3.gov.

91. In total, J.M. invested and lost approximately $385,000 USD.

**Victim R.C.**

92. In December of 2021, R.C., a female who currently resides in California, was introduced to the ZBG platform by A.V.

93. R.C. knew A.V. because they both used to live on the same street.

94. A.V. showed R.C. the ZBG platform and charts from A.V.'s past cryptocurrency trades.

95. A.V. told R.C. she was able to successfully withdraw funds from her ZBG account.

96. R.C. never invested in cryptocurrency, but she trusted her friend A.V. Because of this trust, R.C. agreed to invest with A.V. and J.M.

97. A.V. provided all instructions for R.C. to invest with ZBG.

98. R.C. set up an account with Coinbase and sent a wire transfer from her personal banking account to her Coinbase wallet.

99. R.C. then sent the funds from her Coinbase wallet to a ZBG wallet.

100. A.V. told R.C. the specific ZBG wallet to send her cryptocurrency.

101. R.C. never had her own ZBG account and only used A.V.'s ZBG account for her trading investments.

102. Wilson was aware of the group and that they were investing money into A.V.'s account.

103. All the investors' money was commingled into A.V.'s ZBG account.

104. R.C. never had direct communication with Wilson.

105. A.V. notified R.C. of the unsuccessful ZBG account withdrawal, frozen funds, and the requirement by ZBG for more funds to review the account.

106. In total, R.C. invested and lost approximately $2,700,000 USD.

**Victim R.W.**

107. On June 9, 2022, the FBI's Los Angeles, California Field Office telephonically interviewed R.W., a female who currently resides in California.

108. In January of 2022, R.W. posted an advertisement on www.chineseinla.com for rooms she had available for rent.

109. A Chinese male who identified himself as Moyang Xu ("Xu") initiated a conversation with R.W.

110. Xu presented himself as an expert in cryptocurrency trading and presented R.W. with an investment opportunity.

111. Xu and R.W. communicated via WhatsApp.

112. R.W. knew very little about cryptocurrency and cryptocurrency investments.

113. Following Xu's instructions, R.W. created an account with Coinbase and transferred money from her personal banking account to her newly created Coinbase account.

114. Xu guided R.W. on how to install the Exness cryptocurrency trading application and create an account at www.Exnessex.com and later an account at www.Exness-t.com.[10]

115. Xu then guided R.W. to transfer funds from her Coinbase account to her Exnessex and Esness-t accounts.

116. R.W. transferred and converted approximately $100,000 USD to her Exnessex and Esness-t accounts.

117. Xu guided R.W. through a few trades, and R.W. believed she made profit because she was able to withdraw $200,000 USD back into her Coinbase account.

118. R.W. continued to make more deposits into her Exnessex and Esness-t accounts at Xu's direction and pressure.

119. However, when R.W. tried to make another withdraw, she encountered issues within Exnessex and Esness-t which prevented her from withdrawing any funds.

120. R.W. tried to contact Exnessex and Esness-t's customer service regarding her unsuccessful withdrawals.

[10] www.exnessex.com and www.exness-t.com are fraudulent investment platforms and are no longer operational. These two fraudulent websites are similar to www.exness.com which is a legitimate online trading retail broker.

121. Exnessex and Esness-t told R.W. she needed to pay a 30 percent tax on her profits and that her account was frozen due to possible money laundering.

122. R.W. realized this was a scam after Exnessex and Esness-t asked for additional funds for taxes before she could make any further withdrawals.

123. R.W. contacted her local police department and filed an online complaint to the FBI at IC3.gov.

124. In total, R.W. invested and lost approximately $2,300,000 USD.

**Victim Z.Z.**

125. On November 20, 2024, the FBI TRA telephonically interviewed Z.Z., a female who currently resides in Chandler, Arizona.

126. In December of 2021, Z.Z. was contacted by a male individual who went by the name of Weijie Chen ("Chen") via the social media website LinkedIn[11].

127. Chen's LinkedIn profile showed he was a graduate from Fudan University with a Bachelor of Science degree in international finance and a master's degree in economics from Stanford University, and he had 11 years of experience in financial advisory and asset management.

128. Chen contacted Z.Z. through LinkedIn and said he knew her from past acquaintances.

129. Because one of those acquaintances checked out, Z.Z. accepted his request.

130. Chen started conversations with Z.Z. through LinkedIn, but Chen directed her to download WeChat and Signal.[12]

131. Their conversations soon turned to cryptocurrency and investing cryptocurrency.

132. Chen told Z.Z. he had an algorithm to predict the turning points of Bitcoin

[11] LinkedIn is a professional networking platform used worldwide by individuals, businesses, and organizations to showcase work experience, education, skills, and professional affiliations. It serves as an online résumé and career-development tool, allowing users to connect online with colleagues, employers, and industry peers.

[12] WeChat and Signal are public downloaded phone applications that offer a more secure form of communication via texting.

and Ethereum.

133. Chen showed Z.Z. a mathematical equation, which she believed made sense, and therefore trusted his guidance about cryptocurrency.

134. Z.Z. did not know anything about cryptocurrency or how to invest it, so she relied on everything Chen told her and instructed her to do.

135. Chen showed Z.Z. step-by-step how to set up accounts with Coinbase and the Bitsen website www.ioaxes.com/h5.[13]

136. Z.Z. uploaded a copy of her driver's license to Bitsen to create her account.

137. Chen instructed Z.Z. how to transfer money from her personal banking account to her newly created Coinbase account.

138. Chen then instructed Z.Z. how to transfer money from her Coinbase account to her Bitsen account.

139. Z.Z. started small and converted $2,980 USD and transferred that amount into her Bitsen account.

140. With Chen's help and guidance, Z.Z. invested her money and made a small profit from her first trade.

141. Chen convinced Z.Z. to invest more money and Z.Z. converted an additional $79,960 USD into her Bitsen account.

142. After a few more trades guided by Chen, Z.Z. made more money on every trade.

143. Chen further gained Z.Z.'s trust by showing her how to withdraw money from her Bitsen account and back into her Coinbase account.

144. This increased Z.Z.'s confidence and caused her to invest more money.

145. Chen told Z.Z. the higher amount in her Bitsen account, the higher the returns would be.

146. Chen convinced Z.Z. to convert an additional $109,990 USD into her Bisten

[13] www.ioaxes.com/h5 is a fraudulent investment platform and is no longer a functioning website.

account.

147. Z.Z. gathered more money and even used funds that she had set aside for her son's college tuition to invest more money.

148. Z.Z. converted an additional $164,980 USD into her Bisten account.

149. Z.Z. was able to withdraw $6,000 USD back into her Coinbase account.

150. Chen told Z.Z. that she could cash out a portion of her IRA without a tax penalty if she could replenish the same amount back to her IRA within a 60-day period.

151. Z.Z. decided to withdraw $80,000 USD from her IRA and was about to cash out her 401k until she began to realize this might be a scam.

152. Z.Z. did not invest the additional $80,000 she withdrew from her IRA.

153. Z.Z. then tried to withdraw all of her money from her Bitsen account only to be told by the company's customer service that she owed $246,000 USD in taxes. The company demanded that Z.Z. buy $246,000 USD worth of USDT to pay the tax.

154. Z.Z. realized this was a scam and confronted Chen.

155. Chen told Z.Z. to do exactly what the customer service told her to do to get her money back.

156. Chen threatened Z.Z. and told her the federal government would come after her if she did not pay the tax.

157. Z.Z. did not convert any more money and reported the scam to the United States Secret Service, FBI, and her local police department.

158. In total, Z.Z. invested and lost approximately $347,000 USD.

**<u>Victim T.K.</u>**

159. On June 20, 2023, the FBI Anchorage, Alaska Field Office telephonically interviewed T.K., a male who currently resides in Anchorage, Alaska.

160. In December of 2021, T.K. was contacted via a random text message from a female named "Ariana," who claimed to have mistakenly confused his number with someone else's number.

161. After talking back and forth with Ariana, they developed a friendship.

162. Ariana told T.K. she was an investor and works with her uncle who has access and knowledge of cryptocurrency with guaranteed high profits.

163. At the direction of Ariana, T.K. initially invested a small amount of money. T.K. was told by Ariana to invest through his Gemini online digital trading account. T.K. would then transfer funds into his UBAY account at the website www.ubaying.com.[14]

164. After a few trades totaling approximately $900,000 USD, T.K. made profits which prompted him to invest more money.

165. After the "investment period" ended, T.K. tried to withdraw earnings from his UBAY account.

166. Before he was able to make a withdrawal, T.K. was told by the website that he needed to prepay taxes.

167. UBAY claimed to have had an agreement with the IRS to prepay taxes due on all investment gains.

168. T.K. realized he had been involved in a scam and reported the scam to his local police department.

169. T.K. also filed an online complaint to the FBI at IC3.gov.

170. In total, T.K. invested and lost approximately $920,000 USD.

**Victim R.P.**

171. In October of 2021, R.P., a male who currently resides in California, was contacted via a random text message on WhatsApp by a female who identified herself as "Emily."

172. R.P. and Emily had casual conversations over several weeks on WhatsApp.

173. Eventually, Emily brought up the topic of cryptocurrency trading and sent R.P. pictures of her trades and profits.

174. Emily told R.P. he could also make the same trades and could make a lot of money.

[14] www.ubaying.com is a fraudulent investment platform and is no longer an operating website.

175. Emily told R.P. she had an uncle who had an investment business that analyzed the cryptocurrency market and he provided Emily with information about which trades to make.

176. Emily said that with the help of her uncle, her trades had over a 90 percent success rate, and she made eight million dollars over a three-year period.

177. Hearing this information, R.P. agreed to start investing in cryptocurrency.

178. Emily instructed R.P. step-by-step on how to convert money from his personal bank account, into his Coinbase account, and finally transfer funds into an investment website account on www.Jubiopt.com "Jubi."[15]

179. Emily then instructed R.P. on how and when to make trades using the website.

180. R.P. started with a small investment of $3,629 USD for his first trade, as instructed by Emily.

181. After making his first trade, R.P. made a profit.

182. Emily then told R.P. he needed to convert and transfer more funds into his Jubi account to participate in bigger trades and receive higher returns.

183. R.P. believed Emily and transferred more money into his Jubi account.

184. After more successful trades directed by Emily and additional profits made, Emily again pressured R.P. to convert and transfer more money into his Jubi account.

185. R.P. complied and transferred more money.

186. After the "trading period" ended, R.P. wanted to withdraw money from his Jubi account.

187. R.P. tested the process and successfully transferred $2,000 USD back into his Coinbase account.

188. R.P. then tried to transfer a large amount and was told that the transfer "failed to verify."

---

[15] www.jubiopt.com is a fraudulent investment platform and is no longer an operating website.

189. R.P contacted Jubi's customer service and was told his account was flagged for money laundering after a few of his trades resulted in a loss.

190. R.P. was told that to remove the flag, he needed to transfer 60 percent of the loss value back into his Jubi account within 14 business days or his account would be frozen.

191. R.P. complied and transferred $273,000 USD into his Jubi account.

192. R.P. was then told his account was flagged for a security risk and to remove the security risk flag, he needed to transfer an additional 20 percent of his account value within seven business days.

193. R.P. complied and transferred an additional $270,268 USD into his Jubi account.

194. R.P. was told his request was in a queue of approximately 2,887 and would take time unless he was willing to pay an expedited fee and become a VIP member for an additional eight percent of his account value.

195. R.P. did not pay for VIP access and waited for his request to be processed.

196. In February of 2022, www.jubiopt.com stopped working and the website was no longer accessible.

197. Emily told R.P. that Jubi had to change its website address, and the new address was www.jubikda.com.[16]

198. R.P. was told by the website's customer service that there were a few hundred requests in front of him to be processed.

199. R.P. waited over a month for his request to be processed.

200. R.P. checked his status online and was told by the customer service website that his request was being processed; however, for the request to go through, he needed to pay taxes.

201. R.P. was told he needed to pay an additional 13 percent of the total value in

---

[16] www.jubikda.com is a fraudulent investment platform and is no longer an operating website.

his account within seven business days, or his account would be frozen.

202. Emily encouraged R.P. to follow the website's instructions.

203. R.P. realized he had been involved in a scam and made a report to his local police department.

204. R.P. also made a complaint online to the FBI at IC3.gov.

205. In total, R.P. invested and lost approximately $1,185,650 USD.

**Victim H.K.**

206. In January of 2022, H.K., a female who currently resides in California, was contacted via a random text message on the LINE[17] application by a male who identified himself as "Justin."

207. Justin and H.K. sent texts back and forth and became friends.

208. Justin presented himself as a Chinese male who lived in Los Angeles for the past six years, owned his own company, and whose parents live in Florida and own their own company.

209. Justin told H.K. he had been trading in cryptocurrency for years and told her he could teach her how to also trade and make money.

210. H.K. did not know anything about cryptocurrency and agreed to let him show her how it all worked.

211. Justin showed H.K. step-by-step how to wire money from her personal banking account, and then how to convert the money into cryptocurrency.

212. Justin showed H.K. how to move the cryptocurrency to the KiKi application.

213. Justin had H.K. download the KiKi application[18] from the website www.1vmaa.com and not from the application store.

214. H.K. started with a small investment of $30,000 USD. She converted the USD into cryptocurrency and then transferred the cryptocurrency into her KiKi account.

---

[17] LINE is a mobile communication app that offers end-to-end encryption for messaging, voice calls, video calls, and social networking features.

[18] Both the Kiki application and www.lvmaa.com were suspected fraudulent websites and applications.

215. After a few successful trades directed by Justin, H.K. made a profit.

216. Justin told H.K. the more money in her account, the more money she would make, and he encouraged her to deposit and convert more money.

217. H.K. trusted Justin and transferred more money into her account.

218. Justin also suggested H.K. find friends and family to invest with her so she could experience higher returns.

219. H.K. convinced her brother and a friend to invest money with her.

220. They formed a partnership that included Justin.

221. H.K.'s brother, friend, and Justin transferred money into her KiKi account and agreed to split the profit based on the percentage gained.

222. After a few successful trades, H.K. decided to make a withdrawal from her KiKi account.

223. H.K. was told by the website's customer service that she needed to pay $250,000 USD in taxes before she could make a withdrawal.

224. Justin confirmed to H.K. this was KiKi's policy and she needed to pay the taxes.

225. H.K., her brother, and friend all paid the taxes.

226. H.K. was told by KiKi's customer service that she was 873 in queue to process her request.

227. H.K. was told she could pay $100 USD for everyone in front of her in the queue to expedite the process.

228. The group paid $87,000 USD to expedite the process; however, they were still unable to withdraw any funds.

229. In April of 2022, H.K. was no longer able to log into her KiKi account and Justin disappeared.

230. H.K. tried to contact KiKi's customer service but received no response.

231. H.K. realized she had been involved in a scam and reported the scam online to the FBI at IC3.gov.

232. In total, H.K. invested and lost approximately $563,000 USD.

**Victim R.K.**

233. On December 3, 2024, the FBI TRA telephonically interviewed R.K., a male who currently resides in Texas.

234. In January of 2022, R.K. was going through a divorce and was trying to make money.

235. R.K.'s friend introduced him to a guy named Nick who advertised himself as a financial advisor and trader.

236. R.K. and Nick communicated over the Signal[19] application for a few weeks and talked about cryptocurrency and trading.

237. R.K. knew very little about cryptocurrency and trading and relied entirely on what Nick advised him.

238. Nick instructed R.K. step-by-step on how to create accounts and transfer money from his personal banking account into his newly created cryptocurrency Coinbase account.

239. R.K. would send Nick screenshots of his account and Nick would guide R.K. on what to do next.

240. Nick directed R.L. to the Comex[20] investing and trading website.

241. R.K. believed the Comex trading website was a version of the Chicago Mercantile Exchange known as CME group, which is known to be a legitimate exchange website.

242. Nick instructed R.K. when and how to trade using the Comex website.

243. After a few trades, R.K. made a profit.

244. R.K. made a successful withdrawal from his Comex account which further solidified his trust in Nick and the advice he was given.

245. R.K. told his friends about the investment and he became part of a group of

[19] Signal is a mobile communication app that has end-to-end encryption for messaging, voice calls, video calls, and social networking features.
[20] COMEX was a suspected fraudulent online investing trading platform website.

seven investors that converted and transferred money into separate Comex accounts.

246. Nick became very pushy and adamant that R.K. invest more money and wanted him to convince more family and friends to invest.

247. R.K. became suspicious and tried to withdraw his money from his Comex account.

248. R.K. was told by the website's customer service it would take approximately four weeks to process his request.

249. R.K. went back to the website after four weeks and was told he had to wait another four weeks.

250. R.K. realized he had been involved in a scam and reported the scam to his local police department.

251. R.K. also filed a complaint online to the FBI at IC3.gov.

252. In total, R.K. invested and lost approximately $218,000 USD.

**Victim X.K.**

253. In January of 2022, X.K., a female who currently resides in Ohio, was contacted online via LinkedIn, by a male who identified himself as JunHua Lin ("Lin").

254. Lin's LinkedIn profile presented him as a Harvard University graduate with a master's degree in finance and a master's degree in business administration.

255. Lin's profile also stated he worked for Goldman Sachs for the previous three years and had recently left that job in November of 2021.

256. Lin told X.K. he was a private and independent investor.

257. Lin requested another social media platform to connect with X.K. They moved their conversations to the WeChat application and continued talking on that platform.

258. Lin's LinkedIn profile was deleted a few days after connecting with X.K.

259. Lin told X.K. he invested in various areas to include education, medical health, and cryptocurrency.

260. Lin told X.K. he had a special analysis team located in China, and they

calculated trading points.

261. Lin told H.K. his accuracy was above 95 percent.

262. X.K. did not know much about cryptocurrency or investing and relied on everything Lin told her.

263. X.K. did not have a lot of money, but she wanted to invest.

264. X.K. started with an investment of $3,185 USD.

265. Lin taught X.K. how to transfer money from her personal banking account, convert that money into cryptocurrency using her Coinbase account, and transfer the cryptocurrency to an investing platform at www.bilinkall.com[21].

266. Lin directed X.K. through a few trades and she made approximately $700 USD in profit.

267. X.K. was able to transfer the money out of her Bilinkall account and back into her Coinbase account.

268. This increased her confidence and trust in Lin.

269. Lin told X.K. the more money she had in her account, the more money she could make on her trades.

270. Lin tried to convince X.K. that she could withdraw $300,000 USD from her 401k account without penalty, if she was able to put the money back into her account within a 60-day period.

271. X.K. contacted Fidelity Investments and confirmed she was able to make a one-time withdrawal without penalty.

272. X.K. was hesitant but agreed to withdraw $283,000 USD from her 401k account.

273. X.K. also took out a personal loan for $44,000 USD.

274. X.K. then converted $327,000 USD into cryptocurrency and transferred it to her Bilinkall account.

---

[21] Bilinkall.com was a suspected fraudulent online investing trading platform and is no longer a working website.

275. With Lin's help, X.K. made eight more trades which resulted in profits that showed in her Bilinkall account.

276. Lin told X.K. to keep adding more money into her account.

277. X.K. took out more money from her Fidelity account and converted an additional $72,000 USD into her Bilinkall account.

278. Eventually, X.K. tried to withdraw money from her Bilinkall account and the withdrawal failed.

279. Bilinkall's customer service told X.K. she had to pay a tax of $278,000 USD before she could make a withdrawal.

280. Customer service said they were unable to take the tax from her account, and they were unable to provide X.K. with any regulations or policies upon request.

281. Lin told X.K. that the same thing happened to him, but he paid the tax and he was able to withdraw all his money.

282. X.K. still trusted Lin and tried to gather money to pay the tax.

283. X.K. borrowed money from her friends, took out another personal loan, and came up with an additional $200,000 USD.

284. X.K. transferred $200,000 USD into her Bilinkall account.

285. Lin paid the remaining $78,000 USD tax balance to help H.K., and she believed he was a good friend.

286. After paying the tax, X.K. was told by customer service that her account was suspected of illegal profit and asked her to download software called BXMEX[22] from www.qzblm.com[23] to solve her issue.

287. X.K. downloaded the software and BXMEX told X.K. she needed to pay $296,000 USD as a security deposit.

288. X.K. again asked for policies and regulations; however, none were provided.

---

[22] BXMEX was a suspected fraudulent online investing trading platform and is no longer a working website.

[23] Qzblm.com was a suspected fraudulent online investing trading platform and is no longer a working website.

289. X.K. realized this was a scam and reported it to her local police department.

290. X.K. also filed an online complaint to the FBI at IC3.gov.

291. In total, X.K. converted and lost approximately $602,722 USD.

**Victim J.L.**

292. On December 3, 2024, the FBI TRA telephonically interviewed J.L., a female who currently resides in California.

293. In January of 2022, J.L. was contacted by a male individual who went by the name of Alvin Deng ("Deng") through the social media website LinkedIn.

294. Deng and J.L. talked on LinkedIn for a day or two, and then Deng requested they move their conversation to WeChat.

295. Deng would send J.L. screenshots of his account and the money he made by trading cryptocurrency.

296. Deng's LinkedIn profile showed he was a well-educated Chinese male who was currently employed at J.P. Morgan Chase Bank as a financial advisor.

297. J.L. did not know anything about cryptocurrency or how to invest cryptocurrency.

298. Deng offered to teach J.L. how to invest her money.

299. J.L. trusted Deng and agreed to invest some of her money.

300. Deng taught J.L., step-by-step, how to transfer money from her personal banking account into her newly created cryptocurrency Coinbase account.

301. J.L. sent Deng screenshots of her account and Deng instructed J.L. what to do next.

302. Deng instructed J.L. on how to create accounts with the investment website Bitsen and the Alchemig investment website.[24]

303. J.L. made instant profits on a few trades directed by Deng.

304. J.L. made more deposits based on her past successful trades.

305. Deng told J.L. the more money she had in her account, the higher her returns

[24] The Bitsen and Alchemig websites are fraudulent and are no longer operating websites.

would be.

306. J.L. then convinced her husband and sister to also invest.

307. J.L. borrowed money from her family and friends and took out personal loans to invest more money.

308. Deng told J.L. she could make a one-time, penalty-free, withdrawal from her 401k account, if she could replenish the funds within a 60-day period.

309. J.L. withdrew $60,000 USD from her 401k account, converted it into her Coinbase account, and invested as directed by Deng.

310. J.L. made many trades with the help of Deng and her online Alchemig account showed a gained balance of $1,800,000 USD.

311. In April of 2022, J.L. wanted to make a large withdrawal; however, she was told by the website's customer service her account was frozen due to illegal activity and possible money laundering.

312. J.L. realized this was a scam and filed a report with her local police department.

313. J.L. also filed an online report to the FBI at IC3.gov.

314. In total, J.L. invested and lost approximately $400,000 USD.

**TRACING VICTIM FUNDS TO THE DEFENDANT PROPERTY**

315. The defendant property consists of tracing specific stolen funds from the victims.

316. The tracing demonstrates the concerted efforts by the scammers to conceal and disguise the nature, location, source, ownership, and control of stolen funds to the defendant property.

317. Each victim transferred their currency from their personal bank accounts to their cryptocurrency accounts.

318. The victims then transferred their cryptocurrency to a wallet address provided by the scammers(s).

319. Each victims' stolen funds were then rapidly transferred in and out of

multiple intermediary wallet addresses, were commingled with other funds, and ultimately arrived at the defendant property.

## TRACING OF SIX VICTIM FUNDS TO USDT ADDRESS 1

320. The two diagrams below show movement from six victims' stolen funds transferred to a wallet address provided by the scammer(s) beginning on January 24, 2022 to January 25, 2022, passing through Intermediary Address A and Intermediary Address B, to USDT Address 1.

321. The diagram below (the first of two diagrams) shows the movement of victims' stolen funds to Intermediary Address A and Intermediary Address B:




322. The diagram below (the second diagram) is a continuation of the above

movement of the six victims' stolen funds through Intermediary Address A and Intermediary Address B to USDT Address 1.




## TRACING OF EIGHT VICTIM FUNDS TO USDT ADDRESS 2

323. The next two diagrams show the movement of eight victims' stolen funds transferred to a wallet address provided by the scammer(s) beginning on December 31, 2021 to February 4, 2022, passing through Intermediary Address C and Intermediary Address D to USDT Address 2.

324. The diagram below (the first of two diagrams) shows the movement of

victims' stolen funds to Intermediary Address C and Intermediary Address D:




325. The diagram below (the second diagram) is a continuation of the above movement of the eight victims' stolen funds through Intermediary Address C and Intermediary Address D to USDT Address 2:

//

//

//

//




326. The movement of stolen funds depicted in the diagrams above is a common tactic used by individuals who are attempting to launder large amounts of cryptocurrency.

327. The rapid and varied movement of stolen funds increases the difficulty to trace, and ultimately recover, any of the proceeds or discover the scammer(s) identities.

328. There is little legitimate reason, economic or otherwise, for the use of such a complex movement of cryptocurrency – the purpose is to conceal and disguise the nature, location, source, ownership, and control of the funds.

**USDT ADDRESSES 1 AND 2 HAVE OVERLAPPING CONNECTIONS**

329. All the victims were victims of a pig butchering scheme with some variation in the execution/fraudulent stories told to induce the victims to give their money to the scammer(s) and some variation in the "investment platforms" used to facilitate the crimes.

330. There are significant overlapping connections in how the victims' stolen funds were transferred, and ultimately, shows the connection between USDT Address 1 and USDT Address 2, where the victims' stolen funds were transferred to.

331. For example, C.S. (stolen funds transferred to USDT Address 1) was directed to use a fraudulent UBAY investment platform.

332. Likewise, while T.K.'s stolen funds were transferred to USDT Address 2, the scammer(s) also directed T.K. to a fraudulent UBAY investment platform.

333. Additionally, there are two victims, Z.Z. and A.V., whose stolen funds were transferred to both USDT Address 1 and USDT Address 2.

334. At least three fraudulent investment platforms have overlap between the victim whose funds were transferred to either USDT Address 1 or USDT Address 2.

335. As displayed in the chart below, there is overlap in the fraudulent investment platforms to which the scammer(s) directed the victims to use:

| Victim | Fraudulent Investment Platform | Stolen Victim Funds Funneled To |
|---|---|---|
| Z.Z. | Bitsen | **USDT ADDRESS 1** |
| Z.Z. | Bitsen | **USDT ADDRESS 2** |
| J.L. | Bitsen | **USDT ADDRESS 2** |
| R.C. | ZBG | **USDT ADDRESS 1** |
| J.M. | ZBG | **USDT ADDRESS 1** |
| A.V. | ZBG | **USDT ADDRESS 1** |
| A.V. | ZBG | **USDT ADDRESS 2** |
| C.S. | UBAY | **USDT ADDRESS 1** |
| T.K. | UBAY | **USDT ADDRESS 2** |

336. There is also overlap in the exchange accounts used to transfer the victims'

stolen funds prior to those funds being transferred to USDT Address 1 and USDT Address 2.

337. As part of this scheme, there was a Binance account opened in the name of On Chick Hau and there was also an HTX[25] account opened in the name of On Chick Hau.

338. The Binance On Chick Hau account was opened with an identity card from Malaysia.

339. Both the Binance On Chick Hau account and the HTX On Chick Hau account were used to receive stolen victims' funds, withdrew those stolen victims' funds to other wallet addresses, and then transferred funds to USDT Address 1 and USDT Address 2.

340. Based on the evidence discussed above, the same individual(s) controlled the Binance On Chick Hau account and the HTX On Chick Hau account. The use of the Biance On Chick Hau account and the HTX On Chick Hau account, along with the movements of the victims' funds, are indicative of a tactic to conceal and disguise the nature, location, source, ownership, and control of the illegal proceeds in this scheme.

**FIRST CLAIM FOR RELIEF**

341. The United States incorporates and reincorporates all the allegations contained in paragraphs 1 through 340 as those fully set forth herein.

342. The defendants *in Rem* constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity as defined in 18 U.S.C. § 1956 (c)(7), including wire fraud, 18 U.S.C. § 1343, or a conspiracy to commit such offense, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**

343. The United States incorporates and reincorporates all the allegations contained in paragraphs 1 through 340 as those fully set forth herein.

344. The defendants *in Rem* were involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or a conspiracy to commit such

---

[25] Binance was founded in 2017 in China and is a cryptocurrency exchange. HTX, formerly known as Huobi, was founded in 2013 in China and is a cryptocurrency exchange. The United States of America is a restricted country for both Binance and HTX.

offense, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United Sates of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

DATED this 23rd day of September 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*/S/LaTanya L. Wateland*
LATANYA L. WATELAND
Assistant United States Attorney